# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 3:24-mj-00044
Subject Devices 1, 2, 3, 4, and 5, currently in the custody )
and control of the DEA Dayton Resident Office )
3821 Colonel Glenn High, Beavercreek, Ohio )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ____Southern____ District of ____Ohio____, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances |

The application is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

CALVIN BURCH (Affiliate)
*Digitally signed by CALVIN BURCH (Affiliate)*
*Date: 2024.01.16 12:58:46 -05'00'*

*Applicant's signature*

TFO Calvin Burch, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
____Telephone____ *(specify reliable electronic means)*.

Date: 1/16/24

City and state: Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Calvin Burch, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") within the meaning of Title 21, United Stated Code ("U.S.C."), Section 878, that is, and officer of the United States who is empowered by law to conduct criminal investigations of and to make arrests for offenses as detailed in 21 U.S.C. § 878.

2. I am a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration ("DEA"), and have been since March 2022. I have been employed in law enforcement since February 2015. I currently serve as an officer with the Springfield Police Division ("SPD"). I have been assigned to Patrol Operations and am currently assigned to the Narcotics Bureau. I have extensive prior experience in investigating drug cases that resulted in successful prosecution of persons involved in trafficking of drugs, possession of drugs, and gun related offenses. I have conducted narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics and weapons, participated in undercover narcotic purchases, and supervised the activities of informants who have provided information and assistance resulting in narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution and sales of controlled substances often operate. These subjects usually attempt to conceal their identities and the locations at which they reside, operate, or store drugs and drug proceeds.

3. It has been my experience while conducting other drug investigations that operating drug houses and/or apartments continue to diversify and it is not uncommon to recover different types of illegal drugs from inside the residence. It is also not uncommon to encounter individuals in possession of illegal drugs after leaving from operating drug houses/apartments. In addition, it has been my experience that firearms are commonly kept and located inside operating drug houses and/or apartments.

4. The facts in this affidavit come from my personal observations, my training and experience, the review of certain records, as well as information obtained from other detectives and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

## INDENTICATION OF THE DEVICE TO BE EXAMINED

5. Along with other agents and officers, I am currently involved in an investigation of violations for 21 U.S.C. §§ 846 and 841(a)(1), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, committed by Adrian WHITE, Sonequa MCGRAW, and others. This Affidavit is submitted in support of an Application for a search warrant for the following:

    a. A red iPhone in a case with jewels, listed as Exhibit N-105 (hereinafter referred to as "**SUBJECT DEVICE 1**");

    b. A blue Apple iPhone in a black, blue, and red case listed as Exhibit N-107 (hereinafter referred to as "**SUBJECT DEVICE 2**");

    c. An Apple iPhone in a Nike red and white "Air" case, listed as Exhibit N-102 (hereinafter referred to as "**SUBJECT DEVICE 3**");

    d. An Apple iPhone in a silver and black case, listed as Exhibit N-103 (hereinafter referred to as "**SUBJECT DEVICE 4**"); and

    e. A red Apple iPhone in a clear case, IMEI # 353072104839370, listed as Exhibit N-98 (hereinafter referred to as "**SUBJECT DEVICE 5**").

6. **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4** and **SUBJECT DEVICE 5** are currently in the custody and control of the DEA Dayton Resident Office (DRO), 3821 Colonel Glenn Highway, Beavercreek, Ohio. In my training and experience, I know that **SUBJECT DEVICE 1, SUJECT DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4**, and **SUBJECT DEVICE 5** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of the DEA DRO. The applied-for warrant would authorize the forensic examination of **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4,** and **SUBJECT DEVICE 5** for the purpose of identifying and seizing electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. The United States, including the Drug Enforcement Administration Dayton Resident Office, is conducting a criminal investigation of Adrian White (hereinafter referred to as "WHITE"), concerning violations of federal drug trafficking laws, including 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances).

8. Based on their investigation, investigators have learned that WHITE and MCGRAW conspired to possess methamphetamine and cocaine with the intent to distribute it to others. Based on my training and experience, the amount of methamphetamine and cocaine WHITE and MCGRAW possessed is consistent with trafficking and not for personal use.

2

       The investigation is ongoing and the extent of WHITE and MCGRAW's involvement in the drug trafficking investigation is not yet fully understood.

9. Since August 2023, DEA DRO has been investigating WHITE, MCGRAW, and others for trafficking methamphetamine and other drugs in the Southern District of Ohio and Southern District of Indiana.

10. On January 2, 2024, DEA DRO conducted surveillance on MCGRAW. At approximately 11:46 am, MCGRAW exited 3179 Valerie Arms Drive, got into her Kia Forte and then departed. MCGRAW ultimately traveled to 717 Crestmore Avenue, Dayton, Ohio 45402.

11. Once at 717 Crestmore Avenue, DEA investigators observed MCGRAW exit the driver's seat of her Kia Forte, enter the residence, come back outside to retrieve a Nike shoe box from her vehicle, and then re-enter the front door of 717 Crestmore Avenue.

12. At approximately 1:00 p.m., investigators observed MCGRAW exit the Crestmore Avenue residence carrying a black leather like purse. Investigators then observed MCGRAW get into the driver's seat of her Kia Forte and depart.

13. Shortly thereafter, officers with the Dayton Police Department (DPD) conducted a traffic stop for an equipment violation on MCGRAW on Philadelphia Drive just South of Oxford Avenue. During this traffic stop, a canine conducted a free air sniff around the exterior of the vehicle. The canine is a certified narcotics detection canine. The canine indicated to the presence of narcotics, which then led to a search of MCGRAW's vehicle.

14. While conducting the search of MCGRAW'S vehicle, DPD officers located a green bag which contained a plastic bag with white powder residue. Also located within this bag was two (2) clear plastic bags containing a white powder like substance suspected of being cocaine (later field tested and tested positive for cocaine). Officers also located **SUBJECT DEVICE 1** in a clear case with jewels. MCGRAW was eventually release by DPD Officers at the request of DEA investigators. **SUBJECT DEVICE 1** and the suspected cocaine was seized as evidence of drug trafficking.

15. While MCGRAW was being stopped, additional DEA DRO investigators observed Adrian WHITE depart 717 Crestmore Avenue, with a similar Nike shoebox that MCGRAW brought to the residence.

16. At approximately 1:23 pm, officers with DPD conducted a traffic stop on WHITE for an equipment violation. This traffic stop came directly after Task Force Officer William Sanders observed WHITE leave 717 Crestmore Avenue, Dayton, Ohio with an orange Nike shoebox and get into a silver Chevrolet Impala. Throughout the course of this investigation into this Drug Trafficking Organization, I have identified 717 Crestmore Avenue to be a narcotic stash house and investigators have routinely seen MCGRAW, WHITE, and others transport suspected narcotics in shoeboxes and plastic totes.

17. During this traffic stop, a canine conducted a free air sniff around the exterior of the vehicle. The canine is a certified narcotics detection canine. The canine indicated to the presence of narcotics, which then led to a search of WHITE's vehicle.

18. While searching the vehicle, officers with DPD located a clear tote with an orange Nike shoebox sitting on the front passenger floorboard. Within this clear tote, DPD officers observed multiple Ziplock baggies containing a crystal rocklike substance, suspected of being methamphetamine. The suspected methamphetamine was field tested and tested positive for the presence of methamphetamine with an approximate weight of 2.867 kilograms. This Court authorized an arrest warrant for WHITE based upon the above facts.[1]

19. DPD Officers also located **SUBJECT DEVICE 3** and **SUBJECT DEVICE 4** during the traffic stop. **SUBJECT DEVICE 3** was in WHITE's hand and **SUBJECT DEVICE 4** was in the pants pocket of WHITE. Multiple keys were also located within the silver Chevrolet Impala that WHITE was operating.

20. During WHITE's arrest, investigators sought to obtain a search warrant for 3179 Valerie Arms Drive, 717 Crestmore Avenue and an arrest warrant for MCGRAW. While doing so, investigators learned that MCGRAW went straight to 3179 Valerie Arms Drive after she was released from the traffic stop.

21. Fearing that MCGRAW was potentially discarding or tampering with evidence, investigators waited for her to depart the residence to speak with her concerning the investigation. Furthermore, investigators wanted to ensure that MCGRAW was not removing evidence of a crime from the residence since investigators were applying for, and were subsequently granted, a search warrant for the residence.

22. At approximately 4:45 p.m., Harrison Township Police conducted a traffic stop on MCGRAW's Kia Forte and detained her in reference to the pending search warrant and arrest warrant. While detaining MCGRAW **SUBJECT DEVICE 2** was located.

23. On the same date, this Court, authorized the search and seizure of evidence related to violations of 21 U.S.C. §§ 846 and 841(a)(1), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, at 717 Crestmore Avenue, Dayton Ohio.[2] The Court also authorized the search and seizure of evidence related to violations of 21 U.S.C. §§ 846 and 841(a)(1), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, at 3179 Valerie Arms Drive, Dayton, Ohio.[3] Lastly, this Court authorized an arrest warrant for MCGRAW based upon the above facts.[4]

24. Pursuant to the Court authorized search at 717 Crestmore Avenue, law enforcement located and seized 6,499 grams of methamphetamine in a safe, the kitchen counter, a kitchen

---

[1] *See* Southern District of Ohio Case No. 3:24-mj-4.
[2] *See* Southern District of Ohio Case No. 3:24-mj-3.
[3] *See* Southern District of Ohio Case No. 3:24-mj-2.
[4] *See* Southern District of Ohio Case No. 3:24-mj-5.

cabinet, and an HVAC vent. DEA also seized 309 grams of cocaine in the safe, a kitchen drawer, and an HVAC vent. There was a Ruger handgun located in the kitchen, in addition to an AK 47 style rifle near the front door. WHITE was in possession of the keys to the 717 Crestmore Avenue and the safe. Investigators used the keys that WHITE was possessing to open the closet safe that contained narcotics. Based on my training and experience I know drug traffickers oftentimes possess firearms in order to protect their investment within a residence and to protect themselves from rival drug dealers and drug users attempting to steal their drugs and proceeds of the sale of drugs.

25. Pursuant to the Court authorized search at 3179 Valerie Arms Drive, Unit 14, law enforcement located **SUBJECT DEVICE 5,** in a clear case, along with a large sum of United States Currency.

26. TFO Sanders and I later interview MCGRAW. Post-*Miranda*, MCGRAW stated that WHITE would regularly contact her via **SUBJECT DEVICE 1** in order to pick up drugs and then transport them to a different location where someone would be in order to purchase the drugs that WHITE set up.

27. When investigators inquired about **SUBJECT DEVICE 2** with MCGRAW, she mentioned that **SUBJECT DEVICE 2** was not hers but that she obtained it within WHITE's residence at 3179 Valerie Arms Drive, Dayton, Ohio Unit 14, due to law enforcement seizing **SUBJECT DEVICE 1** at the first traffic stop.

28. Based on my training and experience, I know that drug traffickers typically utilize multiple cell phones to conduct their drug trafficking activities and keep in contact with customers and suppliers of narcotics. I believe evidence of WHITE and MCGRAW's drug trafficking activities, as well as the identity of possible co-conspirators, may be stored in **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5**.

29. Based on my training and experience, your affiant knows that drug traffickers commonly have more than one cellular phone. Drug traffickers commonly use one cellular phone for personal matters known as a "friends and family cellular phone". Drug traffickers commonly use another cellular phone(s) to conduct drug transactions known as a "burner cellular phone(s)".

30. I know from my training and experience investigating drug trafficking, along with purchasing drugs in an undercover capacity, that cell phones are commonly used by drug traffickers to facilitate selling drugs. It is common for drug traffickers to have numerous cell phones in their possession which often contain phone numbers of the drug buyers. The cell phones often contain phone call history with drug buyers, text message conversations setting up drug transactions, photographs of illegal narcotics and/or firearms, and other miscellaneous items relating to drug trafficking.

31. Additionally, based on my training and experience, individuals who commit drug and gun violations commonly take photographs of themselves and others with drugs and firearms.

**SUBJECT DEVICE 1, SUBJUECT DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4** and **SUBJECT DEVICE 5** recovered in this matter are capable of taking and storing photographs.

## TECHNICAL TERMS

32. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

    c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another

location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

7

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33. Based on my training, experience, and research, I know that **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** have capabilities that allow them to serve as a wireless telephone and digital cameras, along with further capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4** and **SUBJECT DEVICE 5** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

37. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

///

///

///

///

///

///

///

///

///

///

## CONCLUSION

38. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

CALVIN BURCH (Affiliate)
Digitally signed by CALVIN BURCH (Affiliate)
Date: 2024.01.16 13:00:20 -05'00'

Calvin Burch
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on January 16, 2024:

Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The property to be searched is the following:

a. A red iPhone in a case with jewels, listed as Exhibit N-105 (hereinafter referred to as "**SUBJECT DEVICE 1**");

b. A blue Apple iPhone in a black, blue, and red case listed as Exhibit N-107 (hereinafter referred to as "**SUBJECT DEVICE 2**");

c. An Apple iPhone in a Nike red and white "Air" case, listed as Exhibit N-102 (hereinafter referred to as "**SUBJECT DEVICE 3**");

d. An Apple iPhone in a silver and black case, listed as Exhibit N-103 (hereinafter referred to as "**SUBJECT DEVICE 4**"); and

e. A red Apple iPhone in a clear case, IMEI # 353072104839370, listed as Exhibit N-98 (hereinafter referred to as "**SUBJECT DEVICE 5**").

**SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** are currently located at the DEA Dayton Resident Office, 3821 Colonel Glenn Highway, Beavercreek, Ohio 45324.

This warrant authorizes the forensic examination of **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** described in Attachment A that relate to violations of 21 U.S.C. §§ 846 and 841(a)(1), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, and involve Adrian WHITE, Sonequa MCGRAW, and other unknown co-conspirators including:

    a. lists of customers and related identifying information;
    b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
    c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
    d. firearms;
    e. packaging equipment; and
    f. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned **SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUJECT DEVICE 4,** and **SUBJECT DEVICE 5** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.